NO. 07-01-0343-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



MARCH 1, 2002



______________________________




IMA McADAMS, INDIVIDUALLY AND AS EXECUTRIX OF THE


ESTATE OF J.Y. McADAMS, DECEASED, APPELLANT




V.



J.Y. JR. (J.T.) McADAMS AND ANNIE McADAMS, APPELLEES




_________________________________



FROM THE 69TH DISTRICT COURT OF HARTLEY COUNTY;



NO. 3739H; HONORABLE H. BRYAN POFF, JR., JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ. 

 Appellant Ima McAdams (Ima), individually and as independent executrix of the
estate of J.Y. McAdams, deceased, brings this appeal from a judgment against her in a
lawsuit brought by her son J.Y. Jr. McAdams (J.T.) or his wife Annie McAdams (Annie) for
damages resulting from a breach of her fiduciary duty as executrix of the estate. Although
the parties are familiar with the somewhat complicated procedural and factual background,
we will recite it in the detail necessary to a proper discussion of the issues presented for
our decision. For reasons we later express, we affirm the judgment of the trial court.

 J.Y. McAdams died in 1974 survived by his wife Ima, and the couple's four children,
J.T., Coretha Brown, (1) Barbara Billups (Barbara) and Margaret Ward. He left a will in which
Ima was appointed as independent executrix of his estate. In his will, he stated that all of
his property was community. He bequeathed his wife a life estate in his community one-half interest with remainder over to his children, share and share alike. In pertinent part,
the will also provided:

 The said Ima L. McAdams shall have the use, benefit, and enjoyment
of said property during her natural life and shall also have the right and
power to use or invade the body of my estate to whatever extent as may be
necessary to provide for her welfare, support and maintenance in the
manner to which she is accustomed.


 During the existence of my said wife's life estate she shall also have
full power and authority to change the form of any or all of the corpus of my
estate by sales, exchanges, encumbrances, investments, purchases or other
despositions [sic] or acquisitions, to the extent deemed advisable by my said
wife in her discretion, all without being liable for any loss incurred in her
exercise of such discretion in good faith. In connection with her exercise of
any such powers, any other party dealing with her shall receive as good a
title to anything transferred by my said wife as if my said wife had been the
fee simple owner thereof, and such other party shall not be required to follow
or inquire into the application or disposition of the consideration paid by such
other party. However, by proper accounting or otherwise, my said wife shall
segregate or maintain the separate identity of the corpus of my estate,
regardless of whether such corpus remains in its original form or is
converted to some other form by her exercise of any of the powers
hereinabove granted.


At trial, Ima testified that she never took any funds from the corpus of the estate to pay for
her welfare, support, or maintenance.

 In the underlying suit, J.T. and Annie originally sued Ima and Barbara concerning
a dispute over a McAdams farm partnership and a claimed breach of fiduciary duty, fraud,
and conspiracy with respect to Ima's administration of the estate. At trial, the court
rendered a take-nothing judgment, which was appealed to this court. In the course of
disposing of that appeal, we reversed and remanded that portion of the trial court judgment
decreeing that J.T. take nothing on his claims against Ima and Barbara arising from the
distribution of the estate of J.Y. McAdams. This appeal results from the retrial of that
portion of the suit.

 In the judgment giving rise to this appeal, the trial court held that J.T. should recover
damages based upon a fraudulent inducement to sign a release of claims arising from the
distribution of the estate. It held that J.T. was entitled to recover damages of $235,083 as
his 25% share of the $940,332 the court found resulted from a diversion of funds by Ima
from the corpus of the estate. The trial court further decreed that J.T. take nothing against
Barbara, that Ima be removed as executrix of the estate, and awarded attorney fees and
prejudgment interest. The trial court entered findings of fact and conclusions of law in
support of its judgment.

 At issue are several transactions that occurred during the administration of the
estate. (2) These include 1) a loan of $501,000 made to J.T. by the estate and Ima, 2) a sale
of some property by the estate to Barbara for $47,000, 3) the purchase of the Keyes Farm
in Oklahoma by Ima, J.T., and Annie, with the estate contributing part of the money for the
purchase, and the subsequent sale of the same property, and 4) a loan given by the estate
for the purchase of an elevator on the Bohlender property. After those transactions, Ima
offered to make a cash distribution to the remaindermen in exchange for a release of all
claims or liabilities against her. In doing so, she represented the value of the corpus of the
estate to be $471,513.19, and J.T. subsequently received $117,878.29, which was one-fourth of the $471,513.19 figure. When he filed his suit, J.T. averred that the corpus of the
estate was actually much greater than that amount. 

 In pursuing her appeal, Ima presents 12 issues for our decision. In the first eight
of her issues, she challenges the legal and factual sufficiency of the trial court's findings
that 1) $84,000 was diverted from the proceeds of a $501,000 loan made by the estate to
J.T. and Annie, 2) $60,000 was diverted from the proceeds of a Bohlender elevator note,
3) $623,333 was diverted from the repayment of the loans made to obtain the Keyes Farm,
and 4) $172,990 in lost profits to the estate occurred as a result of the sale of the Keyes
Farm. In her four remaining issues, Ima asks if 9) by electing to confirm the release,
conveyance, and consent to distribution, J.T. has waived his standing to seek Ima's
removal as executrix of the estate, 10) J.T. is entitled to keep the funds paid him under the
conveyance, release, and consent to distribution and at the same time rescind the
agreement, 11) the award of attorney fees is mandatory, and 12) she, Ima, is entitled to
a $25,000 offset to the judgment together with interest as the result of another judgment
she had recovered against J.T. and Annie.

 As cross-appellant, J.T. asks if 1) the record conclusively shows that Ima caused
damage to the estate of J.Y. McAdams in excess of the damages found by the court in its
judgment with respect to the diversion of proceeds, or 2) alternatively, whether the trial
court's finding as to the amount of those damages is against the great weight of the
evidence, 3) the trial court improperly failed to award damages against Barbara for
conspiracy in the sale of land to her because the record conclusively demonstrates
otherwise or because the trial court's finding otherwise is against the great weight of the
evidence, 4) the trial court improperly calculated the amount of prejudgment interest, 5)
the trial court abused its discretion in failing to award the entire amount of attorney's fees
proved at trial, and 6) the trial court abused its discretion in failing to award exemplary
damages.

 In reviewing a no-evidence issue, we consider the evidence and reasonable
inferences from that evidence which, viewed in their most favorable light, support the trial
court findings, disregarding all evidence and inferences to the contrary. Lewelling v.
Lewelling, 796 S.W.2d 164, 166 (Tex. 1990). If more than a scintilla of evidence supports
the finding, the no-evidence challenge fails. Id. In reviewing a factual insufficiency
challenge, we review all the evidence and reverse only if the challenged finding is so
against the great weight and preponderance of the evidence as to be manifestly unjust. 
In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The trier of fact is the sole
judge of the credibility and the weight to be given to the testimony of the witnesses. See
McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986). Because both parties question
the sufficiency of the evidence to support the trial court's award of damages with respect
to the specific transactions enumerated, we will address each of those transactions
separately. 

 In Ima's first two issues, the subject transaction is a $501,000 loan made in 1988
to effect a bankruptcy settlement. In its findings of fact with regard to this loan, the trial
court found "Ima diverted to her own use and benefit $84,000.00 by taking the funds repaid
to the Estate." Ima denies there was any diversion of this money, while J.T. claims that the
entire amount was diverted.

 J.T. and Annie executed a $501,000 note to Ima as executrix, which was secured
by a deed of trust on land in Dallam County. The note was eventually paid and the deed
of trust released on December 14, 1995. With regard to the diversion, J.T. points to Ima's
testimony that at the time she calculated the corpus of the estate prior to distribution, she
did not include as an asset any credit for the $501,000 note balance. The history of
payments made on the note is confusing. Ima also testified that at the time of this loan,
she did not have $501,000 in the estate, so she borrowed some money on certificates of
deposit owned by the estate. Later, $430,000 (apparently the proceeds of the sale of
some cattle by J.T.) was wire transferred to Ima's personal account. Both Ima and J.T.
denied giving instructions that this money be wired to Ima's personal account. With the
money, Ima averred that she bought certificates of deposit totaling $350,000 in the name
of the estate, and the remainder of $80,000 she applied to a $275,000 debt J.T. owed her
personally. J.T. also gave Ima a check for $100,000 made out to her individually, which,
she said, was applied to the estate corpus. 

 However, Jordan Mills, an accountant who testified for J.T., reviewed the bank
records and ledger accounts kept by Ima, and averred that out of payments made on the
$501,000 note, he could only find that $100,000 was paid to the estate. He also said that
although the note called for 9% interest, he was never able to compute exactly what
interest may have been paid on the note.

 Thus, the evidence is disputed as to how much of the $501,000 loan was actually
repaid to the estate. From the record, we are unable to tell exactly how the trial court
arrived at the figure of $84,000 as the amount of the repayments Ima diverted, and neither
party has offered an explanation of that computation. Even so, that amount is within the
variation of the disputed testimony at trial. There is also the evidence that Ima took
$80,000 from the funds repaid by J.T. and credited it to a personal loan made by her to
J.T. Considering this with the other evidence, the trial court could have rationally arrived
at the $84,000 figure.

 Nevertheless, J.T. contends the amount of money actually repaid to the estate is
irrelevant because it is undisputed that Ima did not include the proceeds of the $501,000
note in the corpus of the estate used to compute the distribution. However, there was
testimony that the estate did not have $501,000 at the time the loan was made and that
Ima borrowed the money, using as collateral certificates of deposit owned by the estate. 
Thus, if that testimony was accepted by the factfinder, it supports an inference that the
$501,000 was not originally in the corpus of the estate but was borrowed, was then
eventually paid back to the lender, and therefore should not have been included in the
corpus as J.T. contends. Ima's first two issues are overruled.

 In considering Ima's third and fourth issues, we must consider whether the trial court
was incorrect in awarding $60,000 in damages for funds diverted from the Bohlender
elevator note proceeds. Parenthetically, J.T. does not challenge this award. In 1985, the
estate and Ima loaned $60,000 each to the Bohlenders to build a grain elevator on land
purchased from the estate. To secure that amount, the Bohlenders executed a note in that
amount secured by a deed of trust. The note was repaid and Ima testified that although
she did not give a special credit for the estate's $60,000 in calculating the estate's value,
it was already included in the corpus of the estate.

 Ima also testified that when she received repayments on money the estate had
loaned, she deposited both principal and interest into the same bank account, although
she attempted to keep separate records herself as to what constituted principal and
interest. There were no estate records per se to show whether repayments of money it
loaned was corpus of the estate or was interest. At trial, the court found that Ima had
diverted to her own use $60,000 that belonged to the estate.

 J.T. argues that it was Ima's burden to show that the estate's money was returned
to the estate because she had admitted that she commingled her individual and estate
funds. Ima argues there was no proof that she improperly retained the estate's money and
the trial court erred in finding to the contrary. In that connection, viewed in the light by
which we must view it, the evidence is both legally and factually sufficient to support the
trial court's resolution of this question. In that regard, the evidence clearly shows that
contrary to the instructions in the will, with respect to money loaned by the estate, Ima
commingled the interest and corpus of repayments made on the loan. Although Ima
asserts that the $60,000 was included in the corpus of the estate for distribution, the
record does not show she was able to trace those repayments to show their inclusion in
that corpus. See Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493, 498-99 (1943). Ima's
third and fourth issues are overruled.

 In determining Ima's fifth and sixth issues, we must examine the purchase of the
Keyes Farm. With respect to that transaction, the trial court found that Ima had diverted
to her use and benefit $623,333 that belonged to the estate. In 1989, J.T. and Ima
purchased a farm near Keyes, Oklahoma, for $1,100,000. Although J.T. and Annie
received a 2/3 interest in the farm with Ima receiving the other 1/3 interest, all of the money
came from Ima and the estate. To finance the purchase, ostensibly J.T. borrowed
$366,666.66 from the estate and the same amount from Ima individually. However, Ima's
ledger sheets show, and she admitted, that the estate actually contributed 85%, or
$623,333.05 of the money loaned to J.T. Ima did not say whether the remainder of the
money advanced came from estate funds or her separate funds. She admitted that if the
money was repaid, the estate corpus would receive only $366,666.66, which was less than
actually came from estate funds. Ima admitted that she did not give any credit for the
estate's contribution to the purchase price when she calculated the amount for distribution
of the estate.

 Ima testified that although J.T. paid some interest on the notes executed by him, no
principal was ever paid. The farm was sold in 1994 for approximately $2,000,000. Of the
profit, two-thirds went to J.T. and one-third to Ima. The loans against the property were
paid off at the time of the sale. Both Ima and J.T. directed the title company in writing to
distribute the remainder of the sale proceeds after the liens were paid, with $594,473
going to J.T. and Annie and $663,904.02 going to Ima. Of the approximately $1,397,000
that she received from the sale, including the repayment of the loans and the portion of the
remainder paid to her, Ima did not return any of those funds to the estate, but placed them
in a certificate of deposit in her own name. The evidence is therefore both legally and
factually sufficient to support the trial court's finding that she diverted $623,333 from the
estate. Ima's fifth and sixth issues are overruled. 

 We note J.T.'s first cross-issue contention that the evidence actually supports an
award to him of $920,318.64 with respect to the loans made in connection with the
purchase of the Keyes Farm. This is so, he argues, because the evidence is
uncontroverted that the estate contributed more than $623,333 to its purchase. Jordan
Mills testified that Ima kept a lot of the estate money in certificates of deposit in the estate's
name. In trying to determine where the money for the purchase of the farm came from,
Mills looked at bank statements, checks, and deposit slips. He claimed to have been able
to trace the amount of estate money used to purchase the farm to an amount of
$920,318.04 based on a ledger sheet used by Ima showing various bank deposits which
were gathered to make up the purchase price of the farm. Further, because the total price
was $1,101,476 and $920,318.64 is 83.55% of that amount and, because he saw some
margin notations on Ima's balance sheets showing 85% attributable to the estate and 15%
attributable to J.T., Mills believed his figure was correct.

 Thus, there was conflicting testimony from Ima and Mills as to the amount of funds
contributed by the estate to the purchase of the Keyes Farm with Ima testifying that the
estate only contributed 85% of the money loaned to J.T. while he contends, supported by
Mills's testimony, the correct amount was 85% of the total purchase price. Because it was
within the trial court's special prerogative as the trier of fact to resolve factual disputes, we
will not disturb the trial court finding. Ima's seventh issue is overruled. 

 The $172,999 included in the trial court's findings as the estate's lost profit on the
Keyes Farm transaction is the subject of Ima's seventh and eighth issues. While she
contends the evidence does not support that inclusion, J.T. contends the amount of profit
attributable to the estate was actually $297,236.78. The parties agree that the farm was
purchased for $1,100,000 and sold for $2,000,000. Therefore, the profit on the sale was
approximately $900,000. The parties also agree that Ima was entitled to one-third of the
profit or approximately $300,000. If the estate contributed $623,333.05 to the purchase
price of the farm, as the trial court apparently found, that contribution amounted to about
57% of the purchase price. The same percentage of Ima's share of the profit is
approximately $171,000. Although that figure is not the exact amount of the lost profit
found by the court, it is sufficiently close to sustain the trial court's findings. Additionally,
as we have noted, Ima admitted she had deposited all the proceeds from the sale received
by her into a certificate of deposit in her name. Ima's seventh and eighth issues are
overruled.

 In her ninth issue, Ima argues that by electing to confirm the release, conveyance
and consent to distribution, J.T. waived any right to seek her removal as executrix of the
estate. She bases that position on the argument that once J.T. elected to take his share
of the distribution, he had no further interest in the estate and therefore had no standing
to challenge Ima's position as the independent executrix of the estate. In response, J.T.
contends that, although the argument might have had merit if the estate had been worth
what Ima represented, because the trial court found it was worth much more than she had
represented, he has not waived his right to seek her removal.

 The trial court found as a matter of fact that Ima misapplied and converted estate
property, failed to make a full disclosure, misrepresented the value of the estate, and failed
to account, all of which constituted gross misconduct and gross mismanagement in the
performance of her duties, which constituted cause for her removal. Thus, the trial court
concluded, Ima had breached her fiduciary duty and should be removed as executrix. The
trial court further concluded that J.T. was not barred "from seeking relief despite not
actually returning consideration received under the release because he satisfied his
'tender' obligation, and because he has a meritorious claim for compensation in excess of
that consideration."

 The existence of standing is a question of law. A & W Industries, Inc. v. Day, 977
S.W.2d 738, 741 (Tex.App.--Fort Worth 1998, no pet.). For a person to maintain a suit,
he must have standing to litigate the matters at issue. Generally, that means some interest
peculiar to him individually and not as a member of the general public. Id. Ima does not
contest that J.T. would have had standing to seek her removal but, as we noted above, she
argues that he has waived that right. The essence of the trial court findings was that Ima
misrepresented the value of the estate, she intended J.T. to rely on her representations,
he did to his detriment, and that he was entitled to damages above the amount of money
he originally obtained and for which he executed his release. The trial court's findings are
sufficiently supported by the record. Because of these findings, J.T. has not waived his
right to seek Ima's removal, even though he never rescinded his release. Damages and
rescission are not mutually exclusive remedies when both are needed to give complete
relief to the complaining party. See LaChalet International, Inc. v. Nowik, 787 S.W.2d 101,
104 (Tex.App.--Dallas 1990, no writ). The record does not show that the estate
administration has ever been officially closed. That being so, in order to accord J.T.
complete relief, it was proper both to remove Ima as executrix and to allow J.T. to recover
his share of the additional value of the estate above that which he had already received. 
Ima's ninth issue is overruled.

 Much of our discussion above is applicable to Ima's tenth issue, in which she
asserts that because J.T. elected to waive rescission of his previous release agreement,
he is bound by the sums he received under that agreement and is not entitled to receive
anything above what he has already received. However, as we have stated, a party is not
necessarily required to choose between rescission and damages when a party has been
fraudulently induced to enter into a contract. Further, as we noted in our previous opinion
on this matter, before J.T.'s acceptance of a benefit can create an estoppel, it must be
shown that the benefit was accepted with knowledge of all material facts. Frazier v. Wynn,
472 S.W.2d 750, 753 (Tex. 1971). Additionally, J.T. had agreed to accept a one-fourth
distribution of the estate. Even if that agreement was not rescinded, it does not mean that
he would not be entitled to receive a one-quarter distribution based on the true value of
the estate as opposed to the represented value. Ima's tenth issue is overruled.

 In her eleventh issue, Ima posits that J.T. is not entitled to receive attorney's fees
because there is no evidence that presentment of his claim was made as required by
section 38.002 of the Civil Practice and Remedies Code, and a party may not recover
attorney's fees for rescission of a contract. In responding, J.T. argues that he not only
sought recovery of attorney's fees under section 38.001 of the Civil Practice and Remedies
Code, but he also sought recovery of those fees under the Property Code and the
Declaratory Judgments Act (section 37.009 of the Civil Practice and Remedies Code). 
Those rights of recovery, he posits, have not been challenged by Ima. In any event, he
contends, there is sufficient evidence of presentment made in his attorney's affidavit on
the subject of fees.

 Under section 38.001 of the Civil Practice and Remedies Code, a person may
recover reasonable attorney's fees if the claim is on an oral or written contract. Tex. Civ.
Prac & Rem. Code Ann. § 38.001 (Vernon 1997). To recover under that section, the
claimant must present the claim to the opposing party and payment for the just amount
owed must not have been tendered by the opposing party before expiration of the 30th day
after presentation of the claim. Id. § 38.002. While it is true that the filing of suit, in and
of itself, does not constitute the requisite presentment, Panizo v. Young Men's Christian
Ass'n of Greater Houston Area, 938 S.W.2d 163, 168 (Tex.App.--Houston [1st Dist.] 1996,
no writ), a presentment of a claim is timely even if made after suit is filed, if it is made at
least 30 days before trial. K.C. Roofing Co., Inc. v. Abundis, 940 S.W.2d 375, 379 (Tex.
App.--San Antonio 1997, writ denied).

 Attached to J.T.'s attorney's affidavit is a copy of a letter dated August 20, 1998, in
which J.T.'s claim is presented. While the court has discretion as to the amount of
attorney's fees, their award is mandatory if the requirements are met. Jackson Law Office,
P.C. v. Chappell, 37 S.W.3d 15, 23 (Tex.App.--Tyler 2000, pet. denied). Additionally,
attorney's fees have been awarded based on fraud arising from a breach of contract. See
Gill Sav. Ass'n v. Chair King, Inc., 797 S.W.2d 31, 31-32 (Tex. 1990); Schindler v. Austwell
Farmers Co-op, 829 S.W.2d 283, 288 (Tex.App.--Corpus Christi), aff'd on other grounds,
841 S.W.2d 853 (Tex. 1992). Ima's eleventh issue is overruled.

 In her twelfth and final issue, Ima claims she is entitled to a $25,000 offset against
the judgment for the amount of the attorney's fees she was awarded against J.T. in the
prior trial of this cause. She also claims an offset for $117,878.29, the amount she had
already distributed to J.T., together with 10% interest per annum from the date of the
distribution. We note that the trial court has only entered judgment for the additional sums
that should have been included in the value of the estate. Thus, the court has not awarded
J.T. any double recovery in that regard.

 With regard to the offset for the $25,000 attorney fees, J.T. argues that because
Ima did not request such an offset from the trial court, she has waived the right to make
that claim on appeal. Ima neither cites any authority that she is now entitled to such an
offset, nor does she point out in the record where she made such a request. However, in
making our own review of the record, we find that she did make such a request, in addition
to other requested offsets, in her first supplemental answer. However, Ima does not cite
any portions of the record in which she called that particular request to the attention of the
trial court. Our perusal of the record reveals that the only portions of the prior judgment
Ima asked the trial court to take judicial notice of was with respect to two tractors and a
plow, for which she was asking compensation. Also, she did not raise that question in her
motion for new trial. To preserve a complaint for appellate review, the record must show
it was made to the trial court by a timely request, objection, or motion that stated with
sufficient specificity the grounds for the ruling sought so that the trial court might be made
aware of the complaint. Tex. R. App. P. 33.1(a)(1)(A). By failing to meet that requirement,
Ima has failed to preserve that complaint for our review. Ima's twelfth issue is overruled.

 We have already addressed the basis for J.T.'s first cross-issue with respect to the
legal and factual sufficiency of the evidence supporting the trial court's awards with regard
to the $501,000 loan, the Keyes Farm transaction, and the Bohlender elevator note in
discussing Ima's contentions in that regard. We will not, therefore, address those matters
again. However, because we have not addressed the legal and factual sufficiency of the
evidence with regard to the Billups land transaction, and because it is raised by J.T. in that
issue, we will discuss that question.

 In reviewing a legal sufficiency challenge on an issue upon which the complaining
party had the burden of proof, we examine the record to determine if there is any evidence
to support the finding while ignoring all evidence to the contrary and, if there is no
evidence to support the finding, we must see if the contrary proposition had been
established as a matter of law. Holley v. Watts, 629 S.W.2d 694, 696 (Tex. 1982). As
already stated, a factual sufficiency challenge requires us to review the record for some
probative evidence to support the finding and determine if, in light of all the evidence, the
finding is not manifestly unjust. Traylor v. Goulding, 497 S.W.2d 944, 945 (Tex. 1973).

 On February 17, 1993, Ima sold her daughter Barbara the estate's undivided one-half interest in the east one-half of Section 77 and all of Section 78, Block 2, Brooks &
Burleson Survey, in Hartley County. Barbara executed a $47,000 note payable to Ima as
the executrix of the estate, which was secured by a deed of trust on the property. On
November 30, 1995, Ima, as executrix, transferred the note and the liens securing it to
herself. She then released the note and liens on October 29, 1996. In advancing his
challenge, J.T. contends that no payment was made to the estate for this transfer and,
because of this, the value of the estate prior to the distribution should have been increased
by that amount. The trial court did not make any award with respect to this transaction.

 Ima testified that she could not produce a check for a $47,000 payment from her to
the estate or a deposit slip showing a deposit of any such amount to the estate. She also
admitted that Barbara paid her individually the $47,000 and that she deposited the money
in her individual account. She further admitted that in calculating the value of the estate
prior to her distribution, she did not add a separate credit for the $47,000, but that that
amount was already included in her computation of the corpus of the estate. At the time
the estate was distributed in 1996, she had not yet been paid by Barbara. Therefore, she
averred, she had put her own money in the estate and, when Barbara paid her after
Barbara had received her share of the distribution, she was entitled to put the money in
her own individual account. The trial court, in its capacity as factfinder, was entitled to
accept Ima's testimony and, if accepted, as it obviously was, it is both legally and factually
sufficient to uphold the trial court's refusal to award damages in that respect.

 J.T. also contends that he should have been awarded $28,000 of the profit resulting
from the sale of the estate's undivided one-half interest in the land to Barbara. His
argument is based on the proposition that Ima sold the land to Barbara for less than its fair
market value. The 960 acres was included in the inventory of the estate property at a
value of $100 per acre or a total of $96,000. Both Barbara and Ima said the undivided
interest in the land was sold to Barbara for $100 per acre based on its inventory value in
1974. No current appraisal of the land was made at the time of its sale, but neighboring
land sold at $150 per acre.

 Both parties presented expert testimony about the value of the land. Steve Rogers,
a real estate appraiser, was called by J.T. Rogers testified that based on information he
had gathered about comparable land sales, he estimated the value of the land on February
17, 1995, at $185 per acre. To arrive at the value of the undivided one-half interest, he
applied a discount factor of 15% to 20% because a half interest is not marketed easily. 
By his calculations, the interest in the land would have been worth $75,000 at the time of
its sale. However, he admitted he had never actually been on the land and had only seen
it from the road. He initially had not used the neighboring land, which had sold in his
calculations, but later went back and took it into consideration. However, he did not
change his opinion because he felt the sale of the land was supportive of his valuation,
even though it sold for substantially less than other properties he had used.

 Appraiser Leslie Dodson testified for Ima. He also used the sale comparison
approach in arriving at his valuation of the land in 1995. He valued the estate's one-half
interest at $47,500 based on a value of $150 per acre with a 33 1/3% discount factor. He
averred he had used this formula before and it was an accepted method. He had actually
been on the land and said it was important to do so in order to know about potential water
production on the property and its topography. Even though it was substantially similar,
he admitted he valued the land across the road at $168 per acre.

 Again, the trial court had conflicting appraisals before it. As the factfinder, it was
well within its power to judge the credibility of the experts and the evidentiary weight to be
given their opinion. We cannot fault its resolution of the conflict and find no error in its
refusal to award the damages suggested by J.T. The first two cross-issues of J.T. are
overruled.

 In his third cross-issue, J.T. contests the trial court's refusal to award him damages
against Barbara for conspiracy in regard to the Billups land transaction because, he
reasons, the record conclusively establishes such a conspiracy or, in the alternative, the
trial court's refusal to find such a conspiracy was against the great weight of the evidence. 
J.T. argues that the evidence shows Ima and Barbara acted together to transfer the
estate's interest in the land for less than its fair market value and to divert money away
from the estate, and that they failed to disclose those facts to him. Because of their
actions, he reasons, Ima and Barbara are jointly and severally liable for the value of the
land which they diverted from the estate.

 The essential elements of a conspiracy are 1) two or more persons, 2) an object to
be accomplished, 3) a meeting of minds on the object or course of action, 4) one or more
unlawful, overt acts, and 5) damages as the proximate result. Massey v. Armco Steel Co.,
652 S.W.2d 932, 934 (Tex. 1983). Ima denied that she ever talked to Barbara about
attempting to defeat the estate's interest in the land. Further, she did not remember 
whether Barbara objected to the $47,000 sale price, and she had no conversation with
Barbara other than to tell her she would sell her the land.

 Barbara averred that she was told the purchase price for the property would be
$47,000, she did not seek an appraisal of the property and, she admitted, she did not tell
J.T. about the purchase of the property. Although in her earlier testimony Barbara stated 
she had known the property across the road sold for $150 per acre at the time she made
the purchase, at this trial, she denied that was the case. Barbara also admitted that she
did not make a down payment on the land and that she never made any payments on the
land to the estate. Barbara additionally said that Ima told her the estate would be
distributed and Barbara could give a check in payment of the purchase loan at that time. 
Ima had also told her that she, Ima, was going to buy the note from the estate. Barbara 
averred that she and her sister Margaret prepared a summary of the estate banking
transactions after J.T.'s lawsuit was filed. She did not remember what amounts she saw
recorded in that summary, but in her prior testimony, she had agreed that she did not see
the $47,000 payment recorded.

 After reviewing the evidence, we conclude that J.T. has failed to conclusively
establish that Ima and Barbara entered into a conspiracy and the trial court's failure to find
such a conspiracy was not against the great weight of the evidence. The testimony in the
record shows that Ima told Barbara the estate would sell her the property and what the
price would be. The fact that Barbara did not challenge the sale price and, even though
she may have known nearby land sold for more money, that she did not have an
independent appraisal made is not necessarily evidence that she conspired to defraud the
estate. The evidence also showed that Barbara did not know until after J.T.'s lawsuit was
filed that the estate might not have received any money for the land. The resolution of
inconsistencies in the evidence was within the trial court's power as the factfinder to
resolve, and we do not find it reversibly erred in declining to award conspiracy damages
against Barbara. J.T.'s third cross-issue is overruled.

 In his fourth cross-issue, J.T. challenges the amount of prejudgment interest
awarded him. The gist of his complaint is that the interest awarded was based on the time
period from November 16, 1996, to April 6, 2001, even though the judgment was not
signed until May 25, 2001. That being so, J.T. claims his entitlement to additional interest
for the period from April 6, 2001, to May 25, 2001. Although the record shows that J.T.
filed a motion to modify the judgment to correct the amount of interest awarded, there is
nothing in the record showing the trial court ever ruled on it. Ima does not contest that J.T.
would ordinarily be entitled to prejudgment interest to the date of judgment but, she claims,
J.T. is not entitled to any additional prejudgment interest because he drafted the judgment,
including the calculation of prejudgment interest. Thus, he got what he requested, she
asserts.

 The judgment itself recites that the plaintiff is awarded 6% prejudgment interest from
November 16, 1996, "to the date of this Judgment, in the amount of $38.64378 per day."
The judgment further states, "[a]s of the date of this Judgment, the total prejudgment
interest is $61,907.34 . . . ." When a party moves for judgment and judgment is entered
in accordance with the motion, the party waives the right to complain of the judgment on
appeal. Casu v. Marathon Refining Co., 896 S.W.2d 388, 389 (Tex.App.--Houston [1st
Dist.] 1995, writ denied). On the other hand, when a party merely submits a draft judgment
to conform with what the court announced would be its judgment, the party does not waive
his right to complain on appeal. In re Bahn, 13 S.W.3d 865, 875 (Tex.App.--Fort Worth
2000, no pet.); John Masek Corp. v. Davis, 848 S.W.2d 170, 175 (Tex.App.--Houston [1st
Dist.] 1992, writ denied).

 In this case, the record reveals that at the end of trial, the court announced it was
of the belief that the estate was short of money owed to it, but did not announce any
specific award of damages at that time. The court also did not address prejudgment
interest. If the court did make such an announcement at a later time or if it notified the
parties of its decision by letter, it does not appear in the record. There is also no motion
for judgment in the record. Therefore, based on the record before us, the written judgment
was the court's first rendition with respect to prejudgment interest. The error, then, was
judicial rather than clerical. See Comet Aluminum Co. v. Dibrell, 450 S.W.2d 56, 59 (Tex.
1970).

 The judgment was prepared by J.T. and the court entered the judgment draft
submitted by him. Although J.T. could not have known the date the judge would sign the
judgment, he chose to draft it so as to specify the amount of interest awarded. Thus, J.T.
received what he requested and has waived his right to complain on appeal. J.T.'s fourth
cross-issue is overruled.

 In his fifth cross-issue, J.T. complains that the trial court should have awarded him
the entire amount of attorney's fees he proved at trial. In its judgment, the trial court
awarded $98,000 in attorney's fees through trial on the merits, an additional $10,000 if the
judgment was successfully defended in the court of appeals, and another $10,000 if it was
successfully defended in the state supreme court. J.T.'s attorney filed an affidavit in which
he requested $147,043.27 in attorney's fees through trial, with $20,000 for a successful
appeal to the court of appeals and an additional $10,000 for a successful appeal to the
Texas Supreme Court.

 As we noted above, J.T.'s request for attorney's fees is pursuant to section 114.064
of the Property Code, and sections 37.009 and 38.001 of the Civil Practice and Remedies
Code. The relevant portion of the Property Code relates to instances in which a trustee
may recover certain expenses for activities on its behalf. In relevant part, the section
states, "the court may make such award of costs and reasonable and necessary attorney's
fees as may seem equitable and just." Tex. Prop. Code Ann. § 114.064 (Vernon 1995). 
Similarly, section 37.009 of the Civil Practice and Remedies Code provides that in any
proceeding under the Declaratory Judgments Act, "the court may award costs and
reasonable and necessary attorney fees as are equitable and just." Tex. Civ. Prac. & Rem.
Code Ann. § 37.009 (Vernon 1997). J.T. agrees that the award of attorney's fees lies
within the trial court's discretion. We have previously noted that while an award of
attorney's fees pursuant to section 38.001 of the Civil Practice and Remedies Code is
mandatory if the necessary requirements are met, the amount of those fees to be awarded
is discretionary.

 Therefore, under any of the statutes relied on by J.T., the amount of attorney's fees
awarded is reviewed under an abuse of discretion standard. In reviewing an award of
attorney's fees, we must consider 1) the time and labor required, the novelty of the
questions presented, and the skill required to perform the legal services; 2) the likelihood
that the acceptance of the employment precluded other employment by the lawyer; 3) the
fee customarily charged in the locality for similar legal services; 4) the amount involved
and the results obtained; 5) the time limitations imposed by the client or by the
circumstances; 6) the nature and length of the professional relationship with the client; 7)
the experience, reputation, and ability of the lawyer or lawyers performing the services;
and 8) whether the fee is fixed or contingent on results obtained. Aquila Southwest
Pipeline, Inc. v. Harmony Exploration, Inc., 48 S.W.3d 225, 240-41 (Tex.App.--San Antonio
2001, pet. denied).

 In the judgment, J.T. was awarded $296,990.34 and he seeks to recover almost half
that amount in attorney's fees. There were two trials of this case and a prior appeal, the
attorney's fees for which, J.T. argues, cannot be segregated. However, J.T. was
unsuccessful in a portion of the first trial which did become a final judgment. Moreover,
based on the number of times the testimony of witnesses was compared with their
testimony in the first trial, J.T.'s attorneys were able to use testimony from the first trial with
which they were familiar. Considering all the factors we are required to consider, along
with the questions involved, the skill required, and the customary charges in the area, we
find no abuse of discretion in the trial court's attorney's fees award. J.T.'s fifth cross-issue
is overruled.

 In his sixth cross-issue, J.T. posits that the trial court erred in failing to award
exemplary damages. He reasons the evidence conclusively shows that Ima willfully
breached her fiduciary duties and intentionally misrepresented material facts regarding the
assets of the estate and their value. He also argues that Barbara participated in those
activities. We have already held that the trial court did not err in failing to award actual
damages against Barbara, and there is no need to discuss exemplary damages as to her. 

 The Civil Practice and Remedies Code provides for the award of exemplary
damages:

 (A) . . .[E]xemplary damages may be awarded only if the claimant proves by
clear and convincing evidence that the harm with respect to which the
claimant seeks recovery of exemplary damages results from:


 (1) fraud;


 (2) malice; or


 (3) wilful act or omission or gross neglect in wrongful death actions
brought by or on behalf of a surviving spouse or heirs of the decedent's
body, under a statute enacted pursuant to Section 26, Article XVI, Texas
Constitution. . . .


Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon 1997).


 The trial court stated in its findings of fact that Ima misrepresented the value of the
estate to J.T., she intended J.T. to rely on her misrepresentations about the value of the
estate, he actually relied on her misrepresentations, he did not have actual knowledge of
the true value of the estate, and he suffered damages proximately caused by those
misrepresentations. The trial court further found that Ima's actions in misapplying and
converting estate property, failure to make full disclosure, her misrepresentations about
the value of the estate, and her failure to account constituted gross misconduct and gross
mismanagement in the performance of her duties as executrix. Thus, assuming the
evidence was sufficient to support those findings, the trial court could have awarded
exemplary damages. The question, then, becomes whether the trial court was required
to award exemplary damages in this situation.

 The statute itself does not state that exemplary damages must be awarded if fraud
or malice is found, and J.T. has cited no authority that states that proposition. Punitive
damages are only proper in exceptional cases. C & D Robotics, Inc. v. Mann, 47 S.W.3d
194, 201 (Tex.App.--Texarkana 2001, no pet.). The factfinder may assess punitive
damages to deter future misconduct, punish wrongdoers, and reimburse the plaintiff for
remote losses. Browning-Ferris Industries, Inc. v. Lieck, 845 S.W.2d 926, 946 (Tex.App.--Corpus Christi 1992), rev'd on other grounds, 881 S.W.2d 288 (Tex. 1994). The
wrongdoer in this instance is an elderly woman, which, as the trial court noted, by her own
admission is no longer able to fulfill the role of executrix of the estate, at least in part,
because of failing eyesight. The will also gave Ima the right to use the corpus for her own
welfare, support, and maintenance in the manner to which she was accustomed. She
never used that option. Additionally, there was evidence that Ima and J.T. had long had
dealings with one another, including J.T.'s requests for loans from the estate to resolve his
own bankruptcy problems, and some of those dealings had resulted in litigation by J.T. in
which no liability on Ima's part was determined. In view of all of this, the trial court could
have determined there was no need to assess exemplary damages to deter future
misconduct inasmuch as Ima would no longer be in a position to commit those same acts. 
It could also have determined that J.T. had not suffered any remote losses. J.T.'s sixth
cross-issue is overruled.

 In summary, because we have found no reversible error, all issues presented by
both parties are overruled, and the judgment of the trial court is affirmed. 


 John T. Boyd

 Chief Justice



Do not publish.




Johnson, J., concurs.

NO. 07-01-0343-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



MARCH 1, 2002



______________________________




IMA McADAMS, INDIVIDUALLY AND AS EXECUTRIX OF THE


ESTATE OF J.Y. McADAMS, DECEASED, APPELLANT



V.



J.Y. JR. (J.T.) McADAMS AND ANNIE McADAMS, APPELLEES




_________________________________



FROM THE 69TH DISTRICT COURT OF HARTLEY COUNTY;



NO. 3739H; HONORABLE H. BRYAN POFF, JR., JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

 I concur with the results reached by the majority as to Ima's ninth issue and J.T.'s
fourth cross-issue. Otherwise, I join the majority opinion. 


 Phil Johnson

 Justice


Do not publish. 
1. Coretha Brown is now deceased.
2. Nothing in the record indicates the estate has been closed.



har-type:
symbol;mso-symbol-font-family:"WP TypographicSymbols"'>@








I.          Standard of Review  

 A trial court=s ruling on a motion to suppress is reviewed for
abuse of discretion.  Balentine v.
State, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002); Hudson v. State, 247
S.W.3d 780, 783 (Tex.App.BAmarillo 2008, no pet.).  In reviewing a trial court=s determination of the reasonableness of a temporary
investigative detention, appellate courts use a bifurcated standard of review.  Ford v. State, 158 S.W.3d 488, 493
(Tex.Crim.App. 2005).  Almost total
deference is given to a trial court=s determination of the historical facts that the
record supports especially when the trial court=s fact
findings are based on an evaluation of credibility and demeanor.  St. George v. State, 237 S.W.3d 720,
725 (Tex.Crim.App. 2007); Guzman v. State, 955 S.W.2d 85, 89
(Tex.Crim.App. 1997).  The same level of
deference is also afforded to a trial court=s
ruling on application of law to fact questions or mixed questions of law and
fact if the resolution of those questions also turns on an evaluation of
credibility and demeanor.  Montanez v.
State, 195 S.W.3d 101, 108-09 (Tex.Crim.App. 2006).  However, if mixed questions of law and fact
do not fall within these categories, appellate courts may conduct a de novo review
of the trial court=s ruling. Guzman, 955 S.W.2d at 87.








When, as here, no findings of fact were requested nor filed, we view
the evidence in the light most favorable to the trial court=s ruling and assume the trial court made implicit
findings of fact supported by the record. 
See State v. Ross, 32 S.W.3d 853, 855 (Tex.Crim.App. 2000).  If the trial court=s decision is correct on any theory of the law
applicable to the case, it will be sustained. Armendariz v. State, 123
S.W.3d 401, 404 (Tex.Crim.App. 2003); Ross, 32 S.W.3d at 855-56.  Further, the legal question of whether the
totality of the circumstances is sufficient to support an officer=s reasonable suspicion underlying an investigatory
detention is reviewed de novo.  See
State v. Sheppard, 271 S.W.3d 281, 286-87 (Tex.Crim.App. 2008); Kothe v.
State, 152 S.W.3d 54, 62-63 (Tex.Crim.App. 2004). 

Further, we interpret Appellant=s rights under Article I, Section 9 of the Texas
Constitution consistently with the interpretation of his Fourth Amendment
rights under the federal constitution by the United States Supreme Court and
the Texas Court of Criminal Appeals.  Sargent
v. State, 56 S.W.3d 720, 724 n.2 (Tex.App.BHouston
[14th Dist.] 2001, pet. ref=d). 
Accordingly, the standard for investigative stops is the same under the
Texas Constitution as under the United States Constitution.  See Rhodes v. State, 945 S.W.2d 115,
117 (Tex.Crim.App.), cert. denied, 552 U.S. 894, 118 S.Ct. 236, 139 L.Ed.2d
167 (1997). 








The threshold question we must determine is whether Officer Clements=s stop of Appellant was an investigatory detention
or an arrest because the nature of the detention determines the constitutional
parameters which apply to its legality. 
An investigatory detention is distinguishable from a custodial arrest,
and the use of handcuffs does not automatically convert a temporary detention
into a Fourth Amendment arrest.  Sheppard,
271 S.W.3d at 289.  An investigatory
detention, to be constitutionally valid, may be founded upon a reasonable,
articulable suspicion that the person detained is connected with criminal
activity, whereas an arrest, to pass constitutional muster, must be supported
by the greater conclusiveness of probable cause to believe that the person
detained has committed or is committing an offense.  Amores v. State, 816 S.W.2d 407, 411
(Tex.Crim.App. 1991).   

II.         Investigative Detention

A police officer may stop and briefly detain a person for investigative
purposes if, under the totality of the circumstances, the officer has
reasonable suspicion supported by articulable facts that the person detained
is, has been, or soon will be engaged in criminal activity.  Terry v. Ohio, 392 U.S. 1, 21-22, 88
S.Ct. 1868, 20 L.Ed.2d 889 (1968); Ford, 158 S.W.3d at 492.  An investigative detention occurs when an
individual is confronted by a police officer, yields to the officer=s display of authority, and is temporarily detained
for purposes of an investigation.  Johnson
v. State, 912 S.W.2d 227, 235-36 (Tex.Crim.App. 1995).  Whether reasonable suspicion exists is
determined by considering the facts known to the officer at the moment of
detention, and simple subjective good faith alone is not enough.  Davis v. State, 947 S.W.2d 240, 243
(Tex.Crim.App. 1997).








Prior to initiating an investigative detention, an officer must have
reasonable suspicion to believe that an individual is involved in criminal
activity.  Balentine, 71 S.W.3d at
768.  The Areasonableness@ of a temporary detention must be examined in terms
of the totality of the circumstances and will be justified when the detaining
officer has specific, articulable facts, which, when taken together with
rational inferences from those facts, lead him to conclude that the person
detained actually is, has been, or soon will be engaged in criminal
activity.  Ford, 158 S.W.3d at
492.[5]  There is no definitive bright-line test in
evaluating whether an investigative detention is unreasonable.  United States v. Sharpe, 470 U.S. 675,
685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). 
Common sense and ordinary human experience govern over rigid criteria.  Id.  









Whether there is a reasonable suspicion is dependent on both the
content of the information possessed by an officer and its degree of
reliability.  Alabama v. White,
496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).  Both Aquantity and quality@ must
be taken into account and considered in the Atotality
of the circumstances B the whole picture@.  Id. (quoting United States v.
Cortez, 449 U.S. 411, 417 (1981)). 
The factual basis for an investigative detention need not arise
solely from the officer=s personal observation but may derive from the
collective knowledge of other officers when there has been some degree of
communication between those officers; Woodward v. State, 668 S.W.2d 341,
344 (Tex.Crim.App. 1982) (op. on reh=g), cert. denied, 469 U.S. 1181, 105 S.Ct.
939, 83 L.Ed.2d 952 (1985), or information supplied by another person such as
an informant.  Brother v. State,
166 S.W.3d 255, 259-60 (Tex.Crim.App. 2005), cert. denied, 546 U.S.
1150, 126 S.Ct. 1172, 163 L.Ed.2d 1129 (2006); Martinez v. State, 261
S.W.3d 773, 776 (Tex.App.BAmarillo 2008, pet. ref=d).  Even
circumstances Awhich when viewed independently of each other could
be indicative of innocent action@ may give rise to reasonable suspicion; State v.
1998 Toyota Land Cruiser, Oklahoma Tag CMN-633 VIN JT3HT05J9W0007179, 277
S.W.3d 88, 91 (Tex.App.BAmarillo 2009, no pet.), and the possibility of an
innocent explanation does not deprive the officer of the capacity to entertain
reasonable suspicion of criminal activity. 
See T.L.O., 469 U.S. at 346; Toyota Land Cruiser, 277
S.W.3d at 91. 

While a tip by an unnamed informant of undisclosed reliability may
justify the initiation of an investigation, such a tip, standing alone, will
rarely establish the requisite level of reasonable suspicion necessary to
justify an investigative detention.  Florida
v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).  However, a citizen informant=s information may provide an officer with reasonable
suspicion if the information is corroborated by further indicia of reliability,
i.e., some additional facts
from which a police officer may reasonably conclude that the tip is reliable
and a temporary detention justified.  Brother,
166 S.W.3d at 258-59 (citing Alabama v. White, 496 U.S. at 330-31).  








Corroborating information that can give rise to reasonable suspicion
includes details that accurately predict the subject=s future behavior, link the subject to the alleged
criminal activity, or give a particularized and objective reason to suspect the
subject.  Glenn v. State, 967
S.W.2d 467 (Tex.App.BAmarillo 1998, pet. dism=d).  A citizen=s tip deserves great weight when there is a detailed
description of the wrongdoing along with a statement that the event was
witnessed firsthand; Illinois v. Gates, 462 U.S. 213, 234, 103 S.Ct.
2317, 76 L.Ed.2d 527 (1983), when a citizen puts their self in a position to be
held accountable for their intervention; State v. Stolte, 991 S.W.2d
336, 341 (Tex.App.BFort Worth 1999, no pet.), the citizen is not
connected with law enforcement or a paid informant; State v. Sailo, 910
S.W.2d 184, 188 (Tex.App.BFort Worth 1995, pet. ref=d), or there is sufficient evidence that an
informant=s information is reliable based on a past
relationship with law enforcement.  See
Adams v. Williams, 407 U.S. 143, 146-47, 92 S.Ct. 1921, 32 L.Ed.2d 612
(1972); Dixon v. State, 206 S.W.3d 613, 616-17 (Tex.Crim.App. 2006).[6]  Although there is no per se rule
requiring independent police corroboration; Dixon, 206 S.W.3d at 618
(collected cases cited therein), when the reliability of the information is
increased, less corroboration is necessary. 
Stolte, 991 S.W.2d at 341.








Here, Officer Glick received reports from students of future
gang-related fights possibly involving weapons during the end of March and
early April.  Following an incident on
March 31, Officer Glick met with students whom he believed were credible and
reliable based on prior information he had received from them.  His student sources identified Appellant as
one of the persons that students had gathered to watch fight in the parking lot
of the school=s activity center. 
His sources also reported there would be another fight on April 3 and
Appellant would be involved.

As reported, on April 3, two students were assaulted after lunch and
one student sustained serious injuries. 
Although Officer Glick suspected the assaults were gang-related, neither
victim would cooperate.  Afterwards, he
began receiving reports that a gang-related fight was going to occur the next
day, April 4, and Appellant would again be involved.  

When Officer Glick arrived at school on April 4, students approached
him saying that gang members were coming to the school with weapons to shoot
people, including Officer Glick, if he got in the way.  His credible student sources verified the
reports and also reported Appellant would be involved.  At this point, Officer Glick believed he had
a credible threat of violence at the school accompanied by threats of weapons
and shootingsBand Appellant would be involved.  Based upon these reports, he coordinated a
response among school administrators and the APD.  

When, as predicted, Appellant was subsequently identified driving down
a street bordering the school, Officer Glick believed his appearance at the
school coupled with recent events that week and coinciding with reports of a
credible threat of violence involving Appellant, gave him reasonable suspicion
to request that Appellant be stopped, identified, and questioned regarding his
purpose for being in the area.  He
radioed his request to APD officers and Officer Clements initiated a stop of
Appellant=s SUV.  Under
these circumstances, we cannot say that Officer Glick=s assessment of the situation in light of his
specialized training and familiarity with the customs of the school was
unreasonable.  See United States v.
Arvizu, 534 U.S. 266, 276, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).[7]

In evaluating whether there is a reasonable particularized and
objective basis for detaining a person suspected of wrongdoing for further
investigation, government officials must consider the totality of
circumstances.[8]  Because Officer Glick=s information was based on face-to-face encounters
with students,[9]
some of which were known to have provided credible and reliable information in
the past,[10]
we find that Officer Glick had a reasonable suspicion to believe Appellant was
on the school=s perimeter for the purpose of engaging in criminal
activity that might involve weapons and shootings.[11]  Further, there is no evidence of record
indicating Officer Glick=s student sources were connected to law enforcement
or paid informants.

            That
Appellant was detained on a public street bordering the school rather than on
the school=s campus is of no moment. In light of the recent
events at the school as well as the reported threats of gang-related violence,
weapons, and shootings with Appellant being identified by credible sources as
one being involved, Appellant=s presence on the school=s immediate perimeter on the day the violence was to
occur required immediate action to assure the safety of students.  The officers did not need to wait until
Appellant Acrossed the line@ to
detain him.








Having determined Officer Clements=s investigative detention of Appellant was
reasonable under the circumstances, we find the trial court did not abuse its
discretion by finding the marihuana Officer Clements discovered in plain view
in the SUV was admissible at trial and denying Appellant=s motion to suppress.  Appellant=s sole
issue is overruled.          

                                                                   Conclusion

The trial courts judgment is affirmed. 


 

Patrick A. Pirtle 

      Justice 


 

Publish.

      

 

 

 











[1]See Tex. Health & Safety Code Ann. ' 481.121(b)(1) (Vernon 2003).





[2]Officer Glick testified it was not
uncommon for hundreds of students to gather to watch a fight.





[3]Officer Glick also learned from his
sources that the rumored fight at Glenwood Park was a diversion intended to
draw attention away from the school where the actual fight was to occur.    





[4]There was no indication in the
record whether this statement was made prior to receiving warnings regarding
his right against self-incrimination. 
Neither was there any objection to Officer Carroll=s testimony and the voluntariness
of Appellant=s statements were not challenged at
the suppression hearing.  





[5]In New Jersey v. T.L.O., 469
U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the United States Supreme Court
stated:

 

[T]he requirement of reasonable
suspicion is not a requirement of absolute certainty: sufficient probability,
not certainty, is the touchstone of reasonableness under the Fourth Amendment. .
. .

 

469 U.S. at 346 (quoting Hill v.
California, 401 U.S. 797, 804, 92 S.Ct. 1106, 28 L.Ed.2d 484 (1971)).





[6]The same factors applicable when
establishing probable cause are also relevant in the reasonable suspicion
context except that a lesser showing of suspicion is required.  State v. Fudge, 42 S.W.3d 226, 239
(Tex.App.BAustin 2000, no pet.) (citing White,
496 U.S. at 328-29).  When reviewing an
investigative detention under either state or federal law, it is accepted that Alaw enforcement officers may stop
and briefly detain persons suspected of criminal activity on less information
than is constitutionally required for probable cause to arrest.@ 
Johnson, 912 S.W.2d at 235 (quoting Crockett v. State, 803
S.W.2d 308, 311 (Tex.Crim.App. 1991)).  





[7]Officer Glick served as school
liaison officer at the school for twelve years. 
ASchool officials have a specialized
understanding of the school environment, the habits of students, and the
concerns of the community, which enables them to >formulat[e] certain common-sense
conclusions about human behavior.=@ United States v. Sokolow, 490 U.S. 1, 8, 109 S.Ct.
1581, 104 L.Ed.2d 1 (1989) (quoting United States v. Cortez, 499 U.S.
411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).





[8]While making a determination
regarding the more stringent Fourth Amendment standard of probable cause to
search, the Texas Court of Criminal Appeals described the
totality-of-the-circumstances test as follows: 


 

[The] totality-of-the-circumstances
approach is far more consistent with our treatment of probable cause than is
any rigid demand that specific tests be satisfied by every informant=s tip.  Perhaps the central teaching of our decisions
bearing on the probable-cause standard is that it is a practical, nontechnical
conception.  In dealing with probable
cause, . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual
and practical considerations of everyday life on which reasonable and prudent
men, not legal technicians, act. . . .

 

Dixon, 206 S.W.3d at 618 n.20 (quoting
Illinois v. Gates, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527
(1983).





[9]A tip provided by an unidentified Aknown student@ may be relied on as added indicia
of reliability permitting a school official to rely on the tip.  In re K.C.B., 141 S.W.3d 303, 307
(Tex.App.Austin 2004, no pet.). 
Moreover, Texas courts have distinguished between anonymous telephone
informants and informants that personally approach officers.  See, e.g., State v. Garcia, 25 S.W.3d
908, 912-13 (Tex.App.BHouston [14th Dist.]
2000, no pet.).  AUnlike a person who makes an
anonymous telephone call, an individual presenting himself to the officer in
person . . . puts himself in a position to be held accountable for his
intervention; thus, the reliability of the information he provides is
increased.@ 
Id. at 913.  





[10]See Adams, 407 U.S. at 146-47 (held that
informant personally known to officer provided Aenough indicia of reliability@ to create probable cause); Dixon,
206 S.W.3d at 616-17 (held that informant personally known to officer as
credible and reliable based upon past information provided Aenough indicia of reliability@ to create probable cause).  





[11]Officer Glick=s sources had verified
approximately 200 students gathered to witness a fight involving Appellant on
March 31, predicted the violent assault that occurred on April 3 and also
predicted that Appellant, a non-student, would be present at the school on
April 4 to participate in a gang-related fight involving weapons and shootings.
That a tip contains Apredictive information@ capable of verification is also
indicia of reliability.  See Fudge,
42 S.W.3d at 239-40.